**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FANNIE MAE**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**RESERVE APARTMENTS, LTD., *et al.***<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CASE NO. 1:25-CV-01510-BMB**<br><br><br>**JUDGE BRIDGET MEEHAN BRENNAN** |

**<u>TENANTS AND INTERESTED PARTIES WESTERN RESERVE AREA AGENCY ON AGING AND GRAY LOCAL MEDIA, INC'S BRIEF IN OPPOSITION TO RECEIVER'S MOTION TO EXCUSE WEEKLY REPORTING</u>**

Western Reserve Area Agency on Aging ("WRAAA") and Gray Local Media, Inc., which succeeded to the interests of WOIO, LLC ("WOIO"), jointly submit this opposition to the Court-appointed Receiver's April 24, 2026 Motion to Excuse Weekly Reporting (ECF No. 52).

## PROCEDURAL HISTORY

On February 9, 2026, the City of Cleveland wrote directly to the Court to raise urgent concerns about conditions at Reserve Square. The City reported that, since at least December 11, 2025, it had received "consistent complaints" regarding the building at 1701 E. 12th Street, including lack of heat, a flooded parking garage, fire alarms "that go off daily," and a lack of hot water. ECF No. 25, PageID 696. The City emphasized that the lack of heat during "one of the coldest winters Cleveland has seen in years" posed a "huge concern" and that the flooded garage, malfunctioning alarms, and hot-water issues presented additional safety risks. ECF No. 25, PageID 696–97. The City explained that, despite repeated communications with representatives of the Receiver, it had "not seen substantive repairs being made in the building and the

conditions continue to be hazardous." ECF No. 25, PageID 696–97. The City then asked the Court to order the Receiver to repair the boilers on an expedited schedule.

The Receiver responded by letter on February 12, 2026. ECF No. 26. In that response, the Receiver acknowledged significant deferred maintenance and other problems at Reserve Square—including a lack of proper security, evidence of squatters in many of the more than 400 vacant units, unsanitary conditions, and widespread pest infestation—and stated that "work is ongoing." ECF No. 26, PageID 698. The Receiver also outlined certain steps he claimed to have taken or planned to take with respect to heating, the flooded parking garage, fire alarms, hot water, and other building operations. ECF No. 26, PageID 699–701.

In light of the City's letter and the Receiver's response, the Court entered a non-document order on February 12, 2026, directing that, in addition to the Receiver's existing obligations under the August 14, 2025 Receiver Order (ECF No. 11), the Receiver is "to file a weekly status report on the docket regarding any updates, changes, or new complaints received relevant to the issues identified by the City's letter, including heating, the parking garage, fire alarms, hot water, cleanings/treatments, and reports from the building engineer." The Court required that the first weekly report be filed on February 20, 2026 and "continue each Friday thereafter until further order of this Court."

As discussed below, things at Reserve Square are as bad as ever. The Receiver should be required to continue its weekly reporting of the condition of the property.

## WRAAA'S RESPONSE TO THE RECEIVER'S REPORT

### I. The Receiver should be required to continue weekly reporting on the state of Reserve Square.

The Receiver asks to discontinue weekly reporting because, in his view, the concerns that prompted the Court's reporting order have been resolved and because the Court can obtain future

information through monthly reporting. ECF No. 52, PageID 1075-76. Neither reason suffices to excuse weekly reporting.

First, and as discussed below, the Receiver's filings continue to describe conditions in conclusory terms that gloss over how dismal things are at Reserve Square.

Second, when it comes to addressing those issues, the Receiver's reporting often does not speak to any level of finality in the remediation efforts. Indeed, the Receiver continues to represent that repairs are "in progress," being quoted, "approved by the insurer" and scoped but not started, or imminent. ECF No. 49-1, PageID 1016; ECF No. 52, PageID 1074-76; ECF No. 54, PageID 1080; ECF No. 55, PageID 1084. The Receiver's Week 10, Week 11, and now Week 12 submissions largely repeat the same formulations—that there has been "no additional flooding" in the garage, that there are no recent "false alarms," that hot-water or boiler issues have been resolved, and that there have been "no additional operational issues"—with only minor wording changes from one week to the next. See ECF No. 52, PageID 1074-76; ECF No. 54, PageID 1080; ECF No. 55, PageID 1084. Likewise, the March 2026 Receiver's Report essentially copies and pastes the same generalized assurances about security, pest control, elevator service, HVAC performance, and flood remediation, again without acknowledging the ongoing inability of major tenants like WRAAA to use their space in a normal, safe manner. See ECF No. 49-1, PageID 1015-16.

Given this, not only should the Receiver be required to continue weekly reporting, he should be ordered to produce more fulsome reports that accurately convey the condition of the property and communicate tenant complaints. Indeed, WRAAA lodged multiple complaints in March and April 2026 that touch on issues raised in the City's letter, none of which made it into the Receiver's reports despite the court's admonition that the Receiver's weekly reports include

"new complaints received relevant to the issues identified by the City's letter, including heating, the parking garage, fire alarms, hot water, cleanings/treatments, and reports from the building engineer." Exhibit 1, Declaration of Timm Judson ("Judson Decl."), ¶¶ 21-22.

Week 12 only reinforces the point. Again, the Receiver states that the "original heating issues have been resolved," that there have been "no operational issues," that there has been "no additional flooding" in the garage, and that there have been "no additional operational issues." ECF No. 55, PageID 1084. Yet the same report still describes important work as ongoing or prospective: the Receiver has only now selected a contractor for garage shoring, is still arranging an on-site meeting, and says the contractor will be advised to contact the City for permits; likewise, the basement rebuild is merely "anticipated to be completed by May 22, 2026." *Id*. These are not bases to terminate weekly reporting—they are reasons to continue it.

## II. The Receiver's recent reports continue to overstate the condition of the property.

### A. HVAC and hot water issues are not "resolved."

The Receiver states that all five boilers remain operational, that the heating issue is "now resolved," that there have been "no operational issues," and that the building is preparing to transition to air conditioning. ECF No. 52, PageID 1074. The Week 11 report repeats that the "original heating issues have been resolved." ECF No. 54, PageID 1080. Week 12 says the same thing, again stating that the "original heating issues have been resolved," that there have been "no operational issues," and that the heat will be turned off as soon as temperatures are consistently warm. ECF No. 55, PageID 1084. The March report similarly states that Johnson Controls completed repairs to the fifth boiler and that "the system has remained fully operational." ECF No. 49-1, PageID 1016.

WRAAA's experience doesn't comport with Receiver's blanket assertions, which were made at a time when Cleveland was enjoying mild-to-warm spring days. During the recent drop in outside temperatures, employees in WRAAA's space were still relegated to wearing coats indoors for warmth. Judson Decl. ¶ 4. And the expected switch to air conditioning just raises another issue WRAAA has historically had in its space: the ductwork and air handlers generate significant condensation, causing ceiling tiles to become saturated and drip water into occupied spaces. Judson Decl. ¶ 6. In fact, in April, the ceiling in WRAAA's conference room collapsed from a water event. Judson Decl. ¶ 7.

The Receiver's hot-water reports underscore the same point. In Week 10, the Receiver stated there had been "no further issues with the water heaters." ECF No. 52, PageID 1074. In Week 11, however, the Receiver acknowledged that one boiler failed to hold the required temperature that week. ECF No. 54, PageID 1080. And in Week 12, the Receiver reported that Johnson Controls had recommended "additional work on the boilers," even while asserting there had been no issues that past week. ECF No. 55, PageID 1084. This comports with the experience of WRAAA representatives, who reported that the baseboard units through which the water circulates are barely warm to the touch. Judson Decl. ¶ 5.

In sum, WRAAA doesn't agree that the HVAC and hot water issues have been resolved.

**B. The basement and flood-related conditions remain unresolved.**

The Receiver characterizes the garage flooding as an isolated event that "has not been and is not expected to be a recurring issue." ECF No. 52, PageID 1075; see also ECF No. 54, PageID 1080; ECF No. 55, PageID 1084. The March report further states that 360 Fire & Flood completed extraction, drying, and demolition work, that abatement work was completed on April 8, and that rebuild work would begin the week of April 20 after permit approval. ECF No. 49-1,

PageID 1016. Week 11 then states that the rebuild permit was obtained. ECF No. 54, PageID 1080. And now, in Week 12, the Receiver states only that the basement rebuild is "anticipated to be completed by May 22, 2026." ECF No. 55, PageID 1084.

Again, WRAAA's experience is materially different. Certain wall sections in WRAAA's lower-level space were not removed and evidence of the water intrusion remains in certain areas. Judson Decl. ¶ 10. And the lower-level space remains out of use because there has been so much water intrusion and moisture in that area for so long that WRAAA employees do not consider it to be safe.[1] Judson Decl. ¶ 11. So whatever progress has occurred in insurer-approved remediation steps—which, from WRAAA's perspective, has not resulted in a usable lower-level space—the reality remains that WRAAA's lower-level space remains uninhabitable. Judson Decl. ¶¶ 10-12.

### C. Fire alarm issues are not moot just because there have recently been fewer incidents.

The Receiver argues that alarm issues have been addressed because, over a ten-week period, the alarm sounded seven times and was typically triggered by maintenance or construction work rather than an underlying safety issue. ECF No. 52, PageID 1075. These statements reinforce the need for oversight and weekly reporting, not obviate it.

First, seven alarm events in ten weeks is not insignificant in a large occupied building. Second, the fact that some alarms were allegedly tied to construction or maintenance does not eliminate the operational impact on WRAAA, whose employees are often required to evacuate or

[1] WRAAA has already received two OSHA notices of complaints about workplace risks and unsuitability. Judson Decl. ¶ 24.

be sent home for the day after alarms.[2] Judson Decl. ¶¶ 14, 16. Third, this problem seems to come and go; the fact that it has recently been better does not erase the pattern of disruption that has already occurred.

**D. Despite the Receiver's statement to the contrary, other operational issues remain.**

Both the Week 10 and Week 11 reports state that there have been "no additional operational issues." ECF No. 52, PageID 1074; ECF No. 54, PageID 1080. The March report likewise presents a rosy update on security, pest control, elevators, and common-area cleaning. ECF No. 49-1, PageID 1015-16.

The Receiver's reports ignore that the two elevators serving WRAAA's space remain out of service and have been out since August 2025, with no target date for restoration and no meaningful information from the Receiver. Judson Decl. ¶¶ 17-18. Cockroach activity has also begun to increase again despite WRAAA's use of its own exterminator, and the Receiver's statement that full-property roach and bed bug treatments have been completed and weekly pest control is in place. ECF No. 49-1, PageID 1016; Judson Decl. ¶ 19.

* * *

In sum, the Receiver's recent reports repeatedly make definitive assertions—"resolved," "fully addressed," "no further issues," and "no additional operational issues"—that are simply not true when it comes to WRAAA's experience at the property. Significant issues remain as to WRAAA's space, including heating performance, the usability and health conditions of the lower level, elevator outages, recurring pest activity, and the operational problems caused by the building's ongoing state of disrepair. Judson Decl. ¶¶ 4-8, 9-12, 17-19, 21-23. WRAAA believes

[2] Indeed, one of those incidents was an alarm strobe light in WRAAA's space that persisted for three hours before WRAAA instructed employees to go home (yet again). Judson Decl. ¶ 15.

the Receiver should be required to continue his weekly reporting and specifically address the issues raised by WRAAA.

**WOIO's RESPONSE TO THE RECEIVER'S REPORT**

The Receiver asks to discontinue weekly reporting because, in his view, the concerns that prompted the Court's reporting order have been resolved and because the Court can obtain future information through monthly reporting. ECF No. 52, PageID 1075-76. Neither reason suffices to excuse weekly reporting.

Gray joins WRAAA in its opposition set forth herein and the factual assertions set forth above with respect to the continued state of disrepair of Reserve Square. Gray is the second largest commercial tenant at Reserve Square, operating a television station and production facility pursuant to the Lease for approximately 47,867 square feet of office space. Gray broadcasts for approximately fourteen (14) hours a day. Gray's business operations and television broadcasts continue to be substantially impacted by ongoing structural and water leakage issues, repairs, construction, maintenance, concrete falling from the roof of the garage, and disruptive fire alarms.

Gray disputes the factually incorrect assertion made by the Receiver in the Receiver's reports that "Paul Davis Restoration has completed the remediation work in the WOIO commercial area, in locations that had been reported to show past water damage." The water damage has not been remediated. The deteriorating conditions at Reserve Square continue to be a serious liability threatening Gray's employees, staff, broadcasting capabilities, and dissemination of critical information and news that people in this community depend on during emergencies.

Certain, but not all, specific examples are set forth below:

**A. Water and flood-related conditions remain unresolved.**

Leaking water continues to threaten to shut down broadcasts and is causing a wet environment that breeds mold and mildew.

April 1, 2026:

- Heavy leaking water in the first hallway of the building that Gray's employees use to come in from the parking garage.
- Large flooding into the abandoned doctor's office adjacent to Gray's leased premises. Several ceiling tiles were missing and discolored carpet.
- News Director's office: leaking water.
- Assistant News Director's office: leaking water.

**B. Fire alarms continue to go off and disrupt news broadcasts.**

- April 1, 2026 - Fire alarm strobes went on for several hours.
- April 6, 2026 – Fire alarms at various times.
- April 7, 2026 - Fire alarm that disrupted a broadcast that could be heard by viewers.

**C. Concrete continues to fall from the parking garage ceiling.**

- April 2, 2026 - Concrete falling from parking garage. Concrete fell on a truck owned by Orkin resulting in a cracked windshield.
- April 7, 2026 – Large chunk of concrete and debris fell from the ceiling of the parking garage behind a vehicle owned by an employee of Gray.

**D. Other examples:**

- April 2, 2026 -- Parking garage elevator malfunction. A Gray employee reported that the elevator door suddenly closed and would not open.
- April 8, 2026 – The commodes in the bathrooms were not flushing.
- May 8, 2026 – The water to the leased premises was turned off without warning or notice to Gray.

* * *

Gray continues to be deprived of the beneficial use and enjoyment of substantial portions of the leased premises. Multiple offices and work areas have been rendered unusable due to water damage, mold contamination, and related hazards. Significant issues remain as to Gray's leased space. Gray believes the Receiver should be required to continue his weekly reporting and specifically address the issues raised by Gray. Nothing in this response constitutes a waiver of

any right, remedy, or claim Gray may have under the Lease or applicable law, all of which are expressly preserved

Dated: May 8, 2026

*/s/ Scott N. Opincar*
Matthew J. Cavanagh (0079522)
Scott N. Opincar (0064027)
McDonald Hopkins
600 Superior Avenue, East
Suite 2100
Cleveland, OH 44114
T: (216) 348-5400
mcavanagh@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com

*Attorneys for Gray Local Media, Inc.*

Respectfully submitted,

*/s/ William A. Doyle*
William A. Doyle (0090987)
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-2302
T: (216) 241-2838 | F: (216) 241-3707
wdoyle@taftlaw.com

*Attorney for Western Reserve Area Agency on Aging*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties in this case by operation of the Court's CM/ECF system. Parties may access this filing through the Court's system.

*/s/ William A. Doyle*
William A. Doyle (0090987)

198738375